# **EXHIBIT A (Part 1)**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------------------------------------X

SUPPLY COMPANY, LLC,

                                   Plaintiff,

vs.

HARDY WAY, LLC AND ICONIX BRAND GROUP,
INC.,

                                  Defendants.
----------------------------------------------------------------------X

Index No.: _____
Date Purchased & Filed:
May 27, 2016

**SUMMONS**

Basis of Venue: Defendants
principal place of business

**TO THE ABOVE NAMED DEFENDANTS:**

      YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to serve a copy of your answer, or, if the Complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within Twenty (20) days after the service of this summons, exclusive of the day of service (or within Thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated:   New York, New York
          May 27, 2016

**DEFENDANTS' ADDRESSES:**

HARDY WAY, LLC, 1450 Broadway, 3rd Floor, New York, New York 10018

ICONIX BRAND GROUP, INC., 1450 Broadway, 4th Floor, New York, New York 10018

Note: The law provides that: (*a*) If this summons is served by its delivery to you personally within the State of New York, you must appear and answer within TWENTY days after such service; or (*b*) If this summons is served by delivery to any person other than you personally, or is served outside the State of New York, or by publication, or by any means other than personal delivery to you with the State of New York, you are allowed THIRTY days after proof of service thereof is filed with the Clerk of this Court within which to appear and answer.

**LAZARUS & LAZARUS, P.C.,**

*Attorneys for Plaintiffs*

By: _____
Harlan M. Lazarus, Esq.
240 Madison Avenue, 8th Floor
New York, New York 10016
(212) 889-7400

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
-----------------------------------------------------------------------X   Index No.:_____

SUPPLY COMPANY, LLC,

                                     Plaintiff,

    vs.

HARDY WAY, LLC AND ICONIX BRAND GROUP, INC.,

                                     Defendants.
-----------------------------------------------------------------------X

## SUMMONS AND COMPLAINT

LAZARUS & LAZARUS, P.C.
Attorneys for Plaintiff
240 Madison Avenue, 8th Flr.
New York, NY 10016
212-889-7400
212-889-7400
212-684-0314 (facsimile)

To

Service of a copy of the within is hereby admitted.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X    Index No.:_____

SUPPLY COMPANY, LLC,

                                                 Plaintiff,

vs.                                                    **COMPLAINT**

HARDY WAY, LLC AND ICONIX BRAND GROUP,
INC.,

                                                 Defendants.
-------------------------------------------------------------------X

        Supply Company, LLC ("Plaintiff" or "Supply Co."), by its undersigned attorneys complaining against Defendants, Hardy Way, LLC and Iconix Brand Group, Inc. (hereinafter collectively referred to as "Defendants"), respectfully sets forth, represents and alleges:

## Parties

1.      Plaintiff Supply Co. is a California limited liability company, with a principal place of business located at 736 E. 29th Street, Los Angeles, CA 90011.

2.      Upon information and belief and at all times hereinafter mentioned, Hardy Way, LLC ("Hardy Way") is a Delaware limited liability company, with a principal place of business located at 1450 Broadway, 3rd Floor, New York, New York 10018.

3.      Upon information and belief and at all times hereinafter relevant, Iconix Brand Group, Inc. ("Iconix") is a Delaware corporation, with a principal place of business located at 1450 Broadway, 4th Floor, New York, New York 10018. Iconix common stock is listed and trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "ICON."

## Jurisdiction and Venue

4. This Court has jurisdiction over this action as against Defendants pursuant to New York Civil Practice Law and Rules ("CPLR") §301 and CPLR §302(a)1-4.

5. Venue is proper within the State of New York, County of New York.

## Facts

6. Defendant Iconix is a brand management company that owns a diversified portfolio of 35 global brands in the women and men's apparel, entertainment, and home industry segments. Iconix owns brands which it monetizes by licensing their intellectual property rights to retailers and wholesalers, who are responsible for manufacturing and distributing the brands' products, while Iconix is responsible for the brands' advertising, public relations, management and occasionally, sales. In turn, licensees pay royalties to Iconix or one of its joint ventures based upon net sales with a guaranteed minimum if sales targets are not reached.

7. In recent months, these business practices have proven unsustainable: on or about August 5, 2015, Neil Cole ("Cole"), founder and former Chief Executive Officer ("CEO"), Chairman, President and member of the Board of Directors of Iconix, stepped down from his positions with Iconix (a company he founded), amid a flurry of class action lawsuits filed against the company alleging various securities violations.[1] According to recent news reports, Iconix has already acknowledged certain securities violations and, upon information and belief, has conceded that its earnings must be restated.

---

[1] Iconix is currently the subject of lawsuits claiming securities fraud based on, *inter alia,* false regulatory filings to artificially inflate the value of its securities. *See Lazaro v. Iconix Brand Group, Inc.,* 1: 15-cv-04981 (S.D.N.Y. June 25, 2015) and *Niksich v.Iconix Brand Group, Inc.,* 1:15-cv-04860 (S.D.N.Y. June 23, 2015).

8. Recent news reports have also claimed that Iconix used questionable means (including asset sales and joint ventures) to create the illusion of growth while its licensed brands, including Ed Hardy, have declined in viability, all to the detriment of its investors and licensees.

9. Upon information and belief, Hardy Way, was created as a single-purpose entity to hold the legal title to certain trademarks and owns the trade name, trademark and service mark "Ed Hardy" for apparel, accessories, products and services related thereto.

10. At all times hereinafter mentioned and upon information and belief, Hardy Way was, and still is the alter ego of Iconix and acted as an agent for Iconix.

11. According to documents filed with the SEC on May 6, 2016, Iconix has owned 85% of all outstanding membership interest of Hardy Way since April 26, 2011.

12. At all times hereinafter mentioned and upon information and belief, Iconix exercised complete dominion and control over the finances, policies, business practices and activities of Hardy Way.

13. At all times hereinafter mentioned and upon information and belief, Iconix and Hardy Way shared corporate employees and managers.

14. At all times hereinafter mentioned and upon information and belief, Iconix and Hardy Way utilized the same office space.

15. At all times hereinafter mentioned and upon information and belief, Iconix and Hardy Way utilized the same support staff.

16. At all times hereinafter mentioned and upon information and belief, Iconix and Hardy Way utilized the same telephone numbers.

17. At all times hereinafter mentioned and upon information and belief, Iconix and Hardy Way utilized the same telefax numbers.

18. At all times hereinafter mentioned and upon information and belief, Iconix and Hardy Way utilized the same e-mail accounts.

19. In or around November, 2014, Supply Co. and Defendants entered into a license agreement, wherein Supply Co. was the named Licensee ("Licensee") and Hardy Way was the named Licensor ("Licensor") in connection with the Licensor's trademark "ED HARDY" (hereinafter referred to the as the "Hardy Mark") for, *inter alia*, Men's, Juniors' and Kids' apparel, as defined in the License Agreement (hereinafter (a) the licensed Ed Hardy apparel shall be referred to as "Ed Hardy Product" and (b) the Ed Hardy license agreement shall be referred to as the "License Agreement").

20. Before and during the time that the parties were negotiating the License Agreement, Defendants had superior and material nonpublic knowledge, which it had a duty to disclose, but intentionally withheld that: (a) the Hardy Mark had been seriously damaged and was on the verge of having no viability or a lower than expected value and (b) in the months leading up to the parties' execution of the License Agreement, while the parties were negotiating, Iconix, sought to conceal the true state of its financials by making deceptive and misleading public statements and filings with the SEC, which Supply Co. referenced and relied upon and which artificially inflated Supply Co.'s confidence in Hardy Way's parent company.

21. Since executing the Licensing Agreement, Iconix has acknowledged certain securities violations and, upon information and belief, has recently conceded that its earnings must be restated.

4

22. From November 2014 through November 2015, the License Agreement was in full force and effect and governed the relationship, legal and commercial, by and between the parties thereto.

23. Pursuant to the express terms of the License Agreement, Supply Co. held a non-exclusive license right to use the Hardy Mark in connection with the manufacturing, warehousing and distribution of, and billing and collections of Ed Hardy Product.

24. Pursuant to the express terms of the License Agreement, Supply Co. did not have the right to sell Ed Hardy Product.

25. Pursuant to the express terms of the License Agreement, Defendants "shall design, merchandise, offer for sale and sell Products to retailers and any other accounts of its choosing."

26. Pursuant to the express terms of the License Agreement, Supply Co. was to promptly document and accept the orders, accurately reflecting the terms of the applicable sale as agreed to by Defendants.

27. Although denominated a License Agreement, the License Agreement was not a true trademark license agreement.

28. By the License Agreement, Supply Co. acted as Defendants' agent for the manufacture of Ed Hardy Product.

29. Defendants, as principal, directed Supply Co. as agent to manufacture Ed Hardy Product against sales and orders solicited by Defendants, Supply Co. was contractually bound to fill.

30. Defendants at all times directed the manufacturing, selling and marketing of the Ed Hardy Product.

31. Upon information and belief, Defendants hired an individual named Jonathan Cohen for the express purpose of traveling to China to arrange the manufacturing of all Ed Hardy Product that was to later be shipped to Rainbow.

32. Pursuant to the express terms of the License Agreement, Supply Co. was to pay Defendants a minimum royalty for each Annual Period as defined in the License Agreement (each a "Minimum Royalty").

33. Pursuant to the express terms of the License Agreement, Supply Co. was also to pay Defendants a sales royalty equal to twenty percent (20%) of the "Gross Wholesale Sales" as defined in the License Agreement (each a "Sales Royalty"). "Gross Wholesale Sales" is defined under the License Agreement as the aggregate invoiced price of all Ed Hardy Product ordered from Licensee. The License Agreement goes on to state that the invoiced price shall be established by Licensor in its sole discretion, before applying any markdowns, chargebacks or returns ("Deductions").

34. Throughout the negotiation process surrounding the License Agreement, the parties agreed that Supply Co. could apply Deductions against Gross Wholesale Sales as a credit against the Minimum Royalty amount.

35. Nevertheless, the Defendants inserted a provision capping the total Deductions that could be taken against Gross Sales by Supply Co. as a credit against the Minimum Royalty at 18% for a fiscal quarter (hereinafter referred to as the "Cap Provision").

36. When questioned about the Cap Provision, Defendants informed Supply Co. that the change was necessary to get the License Agreement approved and not to worry about the Cap Provision, as Defendants would make good to Supply Co. for Deductions not caused by manufacturing defects or issues.

37.     In or around November, 2014, the Defendants agreed to the sale of $84,247.00 worth of Ed Hardy Product to Rainbow Apparel Distribution Center Corp. ("Rainbow") (hereinafter the November 2014 order shall be referred to as the "Initial Order") and ordered Supply Co. to fulfill the order.

38.     Pursuant to the License Agreement, Supply Co. was required to promptly document and accept the order.

39.     In order for Supply Co. to accept the sale and perform the services delineated under the License Agreement, it was required to enter into a guaranteed minimum markdown agreement prepared between the Defendants and Rainbow, effective for the period beginning November 1, 2014 through January 30, 2016 (hereinafter referred to as the "Markdown Agreement"[2]).

40.     Pursuant to the express terms of the Markdown Agreement, Supply Co. was required to guarantee a Minimum Maintained Markup percentage of 50%, on sales of merchandise received during the period.

41.     The Markdown Agreement goes on to state that Rainbow "will start with at least 50% initial markup percentages, but shall have the right in [its] sole discretion of marking down goods at any time, without any prior approval . . . [and that f]ailure to achieve [a 50%] Minimum Maintained Markup . . . will require [Supply Co. to] reimburse [Rainbow] the difference of what we would have needed in order to achieve the Minimum Maintained Markup percentage target" (hereinafter all reimbursements requested under this clause shall be referred to as the "Markdown Reimbursement"). *See* Exhibit A.

---

[2] A copy of the Markdown Agreement is annexed hereto and made a part hereof as *Exhibit A.*

7

42. Prior to signing the Markdown Agreement, the Defendants assured Supply Co. to not worry about any potential Markdown Reimbursements associated with the Markdown Agreement and that they would see that Supply Co. would not suffer any loss, irrespective of anything in the Licensing Agreement to the contrary.

43. Upon information and belief and in parcel of Defendants fraud on the market, Defendants ignored their legal, ethical and contractual obligations to Supply Co., in lieu of the illicit mechanism embedded in the License Agreement designed to inflate Defendants revenues, here at the expense and loss to Supply Co., all the while concealing the true facts from Supply Co. along with Defendants true malicious intent.

44. On January 1, 2015, Supply Co. shipped the Initial Order.[3]

45. In or around March 2015, Supply Co. was informed that the Ed Hardy Product shipped in the Initial Order was allegedly selling well and that it should not expect to pay any Markdown Reimbursements.

46. Based upon this information, Supply Co. agreed to ship additional Ed Hardy Product orders arranged by the Defendants with Rainbow pursuant to the License Agreement. In total, Supply Co. shipped an additional $4,525,179.00 worth of Ed Hardy Product from January through March, 2015, following the Initial Order (these shipments are hereinafter referred to as "January – March 2015 Rainbow Sales"). *See* Exhibit B.

47. In May 2015, Supply Co. learned for the first time that the Ed Hardy Product allegedly had not sold well and received a Markdown Reimbursement request from Rainbow for a total of $3,300,000.00, which accounted for over 72% of the total selling cost of the previously shipped Ed Hardy Product.

---

[3] A copy of Supply Co.'s Rainbow Shipment Summary is attached hereto as ***Exhibit B***.

48. Thereafter, Supply Co. learned for the first time that Rainbow marked down all of the Ed Hardy Product almost immediately after receiving the Initial Order.

49. Upon information and belief, Defendants knew at the time it made Supply Co. sign the Markdown Agreement that Rainbow was going to take excessive markdowns, even in the event the product sold well.

50. Upon information and belief, Defendants knowingly compelled Supply Co. to manufacture and invoice more Ed Hardy Product than Rainbow could possibly sell: 573,406 garments to place in its estimated 100 total retail locations for children - because the large Rainbow orders would inflate Defendants revenue, solely at the risk of Supply Co.

51. Upon information and belief, Defendants knew and directed Supply Co. to enter into the Markdown Agreement because of Defendants ulterior motive of inflating their Sales Royalty revenue.

52. Since such time, Supply Co. has requested reimbursement from the Defendants for the Markdown Reimbursement. Defendants have yet to provide any reimbursement to Supply Co.

53. The aforementioned conduct of the Defendants irreversibly damaged and destroyed the business of Supply Co.

### As and for a First Cause of Action – Breach of Contract

54. Plaintiff repeats, reiterates and realleges each and every prior allegation hereof in the same manner and with the same force and effect as if hereinafter set forth at length.

55. Defendants were parties to the License Agreement with Supply Co.

56. Pursuant to the License Agreement, Defendants, as principals to Supply Co., sold Ed Hardy Product to Rainbow.

57. Pursuant to the License Agreement, Supply Co., as an agent for the Defendants, promptly documented and accepted those orders, accurately reflecting the terms of the applicable sale as agreed to by Defendants.

58. One of the terms of the sale to Rainbow was the Markdown Agreement.

59. Defendants, as principal, directed Supply Co., its agent, to execute the Markdown Agreement as an agent of Defendants.

60. By directing Supply Co., its agent, to execute the Markdown Agreement, Defendants implicitly and by operation under the law, agreed to bear the losses, costs and expenses of the Markdown Agreement.

61. Defendants violated the License Agreement by failing bear the losses, costs and expenses of the Markdown Agreement.

62. Supply Co., as agents to the Defendants, fully performed and discharged all of its obligations required under the terms of the License Agreement.

63. As a result of the foregoing, Defendants have caused damage to Supply Co., including but not limited to the damages arising out of and relating to the damage and destruction of Supply Co., in an amount to be determined in this action, but not less than $50,000,000.00.

### As and for a Second Cause of Action - Fraud in the Inducement

64. Plaintiff repeats, reiterates and realleges each and every prior allegation hereof in the same manner and with the same force and effect as if hereinafter set forth at length.

65. Upon information and belief, at all relevant times while the parties were negotiating and eventually entered into the License Agreement, Defendants knew the Hardy Mark had been seriously damaged and would continue to decline in viability to the point of being essentially worthless. Defendants had superior, unique, material, nonpublic knowledge, which it

had a duty to disclose to Supply Co., but intentionally withheld.

66. Additionally, as an inducement to enter into the License Agreement and Markdown Agreement, the Defendants knowingly, intentionally and falsely represented to Supply Co. that they would make all efforts to make sure they were not harmed by the Rainbow Markdown Agreement.

67. Moreover, Defendants intentionally misrepresented to Supply Co. that Supply Co. should not expect to pay any Markdown Reimbursement.

68. Defendants knew at the time they made these representations that they were false

69. Supply Co. relied on these misrepresentations when it entered into the License Agreement and Markdown Agreement and again when it promptly accepted the January – March 2015 Rainbow Sales.

70. Supply Co.'s reliance on the Defendants' misrepresentations were reasonable as they were made in the context of beginning a close working relationship with a new vendor that ordered large quantities of Ed Hardy Products.

71. Following the January – March 2015 Rainbow Sales, Supply Co. learned for the first time that the Ed Hardy Products allegedly had poor sales numbers and that Rainbow requested a Markdown Reimbursement of more than $3,300,000.00.

72. Had Supply Co. been made aware of the Defendants' misrepresentations, the markdown or the poor sales figures, it would not have entered into the License Agreement, Markdown Agreement nor would it have agreed to ship the January – March 2015 Rainbow Sales.

73. Defendants perpetrated this fraud and made such false representations, in part and parcel to inflate their Sales Royalty revenue.

74. The fraud perpetrated by the Defendants has caused damage to Supply Co., including but not limited to the damages arising out of and relating to the damage and destruction of Supply Co., in an amount to be determined in this action, but not less than $50,000,000.00.

### As and for a Third Cause of Action – Covenant of Good Faith and Fair Dealing

75. Plaintiff repeats, reiterates and realleges each and every prior allegation hereof in the same manner and with the same force and effect as if hereinafter set forth at length.

76. Under New York law a covenant of good faith and fair dealing is implied in all contracts.

77. Defendants breached the covenant of good faith and fair dealing by all of their aforementioned actions taken.

78. As a result of the foregoing, Defendants have caused damage to Supply Co., including but not limited to the damages arising out of and relating to the damage and destruction of Supply Co., in an amount to be determined in this action, but not less than $50,000,000.00.

79. By reason of the outrageous and egregious conduct of the Defendants, Supply Co. is entitled to an award of punitive damages in an amount as of yet to be determined.

### As and for a Fourth Cause of Action – Unjust Enrichment

80. Plaintiff repeats, reiterates and realleges each and every prior allegation hereof in the same manner and with the same force and effect as if hereinafter set forth at length.

81. By its conduct described above, Defendants received a benefit with respect to the Ed Hardy Product that were delivered by Supply Co. and received and accepted by Rainbow.

82. Defendants have been unjustly enriched at the expense of Supply Co.

83. As a result of the foregoing, Defendants have caused damage to Supply Co., including but not limited to the damages arising out of and relating to the damage and destruction of Supply Co., in an amount to be determined in this action, but not less than $50,000,000.00.

84. By reason of the outrageous and egregious conduct of Defendants, Supply Co. is entitled to an award of punitive damages in an amount as of yet to be determined.

**Wherefore**, Plaintiff demands a judgment against Defendants on all of its Causes of Action, with interest, costs and attorneys' fees as allowed by law, together with such other, further, and different relief to Plaintiff as to this Court may seem just and proper.

Dated: New York, New York

May 27, 2016

LAZARUS & LAZARUS, P.C.
*Attorneys for Plaintiff,*
Supply Company, LLC

_____
HARLAN M. LAZARUS, ESQ.
240 Madison Avenue, 8th Floor
New York, New York 10016
Tel. (212) 889-7400

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X   Index No.:_____

SUPPLY COMPANY, LLC,

                                      Plaintiff,

  vs.

HARDY WAY, LLC AND ICONIX BRAND GROUP, INC.,

                                     Defendants.
-------------------------------------------------------------------X

# SUMMONS AND COMPLAINT

LAZARUS & LAZARUS, P.C.
Attorneys for Plaintiff
240 Madison Avenue, 8th Flr.
New York, NY 10016
212-889-7400
212-889-7400
212-684-0314 (facsimile)

To

Service of a copy of the within is hereby admitted.